**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**BECKLEY DIVISION**

**JOSHUA RONALD SUMPTER,**

      **Plaintiff,**

**vs.**                          **CIVIL ACTION NO. 5:16-CV-08951**

**UNITED STATES,**

      **Defendant.**

**<u>PROPOSED FINDINGS AND RECOMMENDATION</u>**

Pending before the Court are ***<u>Defendant United States of America's Motion to Dismiss</u>*** ***<u>for Lack of Subject Matter Jurisdiction and/or for Summary Judgment Against Plaintiff's</u>*** ***<u>Claims Relating to George Murphy, M.D.</u>*** and ***<u>Memorandum of Law</u>*** in support of same (ECF No. 58, 59) and ***<u>Defendant United States of America's Motion for Summary Judgment</u>*** and ***<u>Memorandum of Law</u>*** in support of same (ECF Nos. 60, 61), all filed on May 17, 2019 pursuant to this Court's Scheduling Order (ECF No. 43). Also pending before the Court are ***<u>Plaintiff's</u>*** ***<u>Motion for Summary Judgment</u>*** (ECF No. 65), ***<u>Defendant's Motion to Strike Plaintiff's Motion</u>*** ***<u>for Summary Judgment (ECF No. 65) for Failure to Comply with the Court's Scheduling Order,</u>*** ***<u>the Federal Rules of Civil Procedure, and the Local Rules of this Court</u>*** (ECF No. 66), ***<u>Defendant's Motion to Strike Plaintiff's Memorandum of Law in Support of its Opposition to</u>*** ***<u>Defendant's Motion to Dismiss and for Summary Judgment (ECF No. 64) for Violating</u>*** ***<u>L.R.Civ.P. 7.1(a)(2)</u>*** (ECF No. 68), and finally, ***<u>Plaintiff's Motion to Strike All of Defendant's</u>*** ***<u>Submissions to the Court Pertaining to Its Interpretation of the FTCA and the Defining Terms</u>*** ***<u>Within Based on Common Law Fraud</u>*** (ECF No. 78).

By Order entered on July 16, 2018, this matter was transferred to the undersigned United States Magistrate Judge for the submission of proposed findings of fact and a recommendation for

disposition pursuant to 28 U.S.C. § 636(b)(1)(B). (ECF No. 39) Having examined the Complaint (ECF No. 2) and having considered the pleadings filed herein, as well as pertinent legal authority, the undersigned concludes that ***Defendant United States of America's Motion to Dismiss for Lack of Subject Matter Jurisdiction and/or for Summary Judgment Against Plaintiff's Claims Relating to George Murphy, M.D.*** (ECF No. 58) should be **GRANTED**, ***Defendant United States of America's Motion for Summary Judgment*** (ECF No. 60) should be **DENIED,** ***Plaintiff's Motion for Summary Judgment*** (ECF No. 65) should be **DENIED**, ***Defendant's Motion to Strike Plaintiff's Motion for Summary Judgment (ECF No. 65) for Failure to Comply with the Court's Scheduling Order, the Federal Rules of Civil Procedure, and the Local Rules of this Court*** (ECF No. 66) should be **DENIED**, ***Defendant's Motion to Strike Plaintiff's Memorandum of Law in Support of its Opposition to Defendant's Motion to Dismiss and for Summary Judgment (ECF No. 64) for Violating L.R.Civ.P. 7.1(a)(2)*** (ECF No. 68) should be **DENIED**, and finally, ***Plaintiff's Motion to Strike All of Defendant's Submissions to the Court Pertaining to Its Interpretation of the FTCA and the Defining Terms Within Based on Common Law Fraud*** (ECF No. 78) should be **DENIED** for the reasons explained *infra*.

## PLAINTIFF'S FACTUAL ALLEGATIONS

This is a medical negligence action brought against Defendant involving alleged conduct by the Beckley Veterans Affairs Medical Center ("BVAMC") for matters occurring in October 17, 2006 and March 16, 2015. (ECF No. 2 at 5) On September 16, 2016[1], Plaintiff, acting *pro se*,[2] filed a Complaint seeking relief pursuant to 38 U.S.C. § 1151[3] and the Federal Tort Claims Act

---

[1] Plaintiff also filed his Application to Proceed without Prepayment of Fees and Costs (ECF No. 1); the undersigned denied same, and Plaintiff submitted the filing fee on January 6, 2017. (ECF No. 5)

[2] Because Plaintiff is acting *pro se*, the documents he has filed in this case are held to a less stringent standard than had they been prepared by a lawyer, therefore, they are construed liberally. See <u>Haines v. Kerner</u>, 404 U.S. 519, 520-521 (1972).

[3] This statute provides for disability payments from the Department of Veterans Affairs ("VA") if claimants can show that disability or death was

("FTCA"), 28 U.S.C. §§ 1346(b) and 2671, *et seq.*[4] Plaintiff stated that he initially filed his Administrative Tort claim on August 8, 2014 with Congressman Rahall's office. (Id. at 13)

Plaintiff alleges that BVAMC providers were negligent in his medical treatment and delayed Plaintiff's benefits. (Id. at 15) Plaintiff's claims stem from a military career-ending diagnosis of Multiple Sclerosis ("MS") in July 2006 that went untreated until August 2011, allegedly causing the progression of his symptoms, resulting in "clinically definitive MS as opposed to possible MS as suspected by the U.S. Army and in turn[] ultimately prevented my re-entry." (Id. at 8) Specifically, Plaintiff has alleged that on or about October 17, 2006, as a result of the negligence by his BVAMC providers, his MS progressed to an "Expanded Disability Status Scale" of 4.0 (with 1.0 being minimal signs of MS and 10.0 being death), for which timely treatment would have decreased the progression of his disease by 70% had he been given Disease Modifying Treatment ("DMT"). (Id. at 5-6)

Plaintiff attached a "Statement in Support of Claim" VA form signed by Enrico Cappiello, M.D. dated July 11, 2013; Plaintiff asserts that Dr. Cappiello reviewed Plaintiff's MRIs of his brain dated December 20, 2006 and May 23, 2007, which demonstrated white matter plaque that became more pronounced and confirmed to have progressed in an MRI dated September 19, 2012. (Id. at 16) Dr. Cappiello concluded that Plaintiff had "undiagnosed MS white matter disease from 2006 until 09/19/2012." (Id.) Plaintiff also submitted two letters by John Berryman, M.D., Chief

---

caused by hospital care, medical or surgical treatment, or examination furnished the veteran . . . in a [VA] facility . . . and the proximate cause of the disability or death was . . . carelessness, negligence, lack of proper skill, error in judgment, or similar instance of fault on the part of the [VA] in furnishing the hospital care, medical or surgical treatment, or examination; or . . . an event no reasonably foreseeable. veterans to apply for benefits who alleged disability due to treatment or vocational rehabilitation either by a Department of Veterans Affairs ("VA") employee or in a VA facility.

38 U.S.C § 1151(a)(1).

[4] The FTCA authorizes suits against the United States for damages for injuries or loss of property or personal injury or death caused by the negligent or wrongful act of omission or employment under circumstances where the United States, if a private person, would be liable in accordance with the law of the place where the act or omission occurred.

of Staff, Beckley VAMC dated March and May 2014, written on Plaintiff's behalf seeking VA disability benefits, ostensibly corroborating Plaintiff's contention that the past MRI studies in December 2006 and May 2007 contained clear unmistakable errors that were either ignored or missed by prior radiologists. (Id. at 17-19)[5] Plaintiff alleges that the errors in his care and treatment for his MS has caused his condition to worsen, which has diminished his quality of life, caused him to have to travel to Ohio Health for "timely and reasonable care" at great expense. (Id. at 15, 14)

## PROCEDURAL HISTORY[6]

As directed by the Court's Memorandum Opinion and Order (ECF No. 35), Plaintiff filed his "Notice of Claim to VA" on June 15, 2018 in which he detailed his medical malpractice claim to the BVAMC with a request that his claim be forwarded to "the VA Office of Special Counsel." (ECF No. 36 at 3) On July 9, 2018, Plaintiff filed two "Certificates of Merit" in support of his claim which included the affidavits of Aaron Boster, M.D., and John Berryman, M.D. (ECF No. 38) Both medical professionals opined that Plaintiff's treatment at the VA was a "deviation" from the standard of care resulting in his advanced MS symptoms. (Id.)

By Order entered on July 16, 2018, the Court lifted the sixty-day stay imposed to allow Plaintiff to obtain legal representation[7] and to comply with the Medical Professional Liability Act

---

[5] Additionally, Plaintiff alleged that on or about March 6, 2015, Defendant committed negligence, malpractice and delayed medical care for failing to fill a prescription despite three separate submissions for said prescription (Id. at 5, 14; Plaintiff also asked for punitive damages for his injuries. (Id. at 6) The Court dismissed Plaintiff's negligence claims as they related to failing to fill a prescription, as well as his claim for punitive damages in the Memorandum Opinion and Order entered on May 10, 2018. (ECF No. 35)

[6] On July 31, 2017, the undersigned issued a previous Proposed Findings and Recommendation. (ECF No. 22) After Plaintiff filed his Memorandum of Objections, "Additional Findings to Certify and Clarify Plaintiff's Understanding of Due Process", and "Submission of Additional Finding" (ECF Nos. 32, 33, 34), on May 10, 2018, the District Court entered a Memorandum Opinion and Order which overruled in part and sustained in part Plaintiff's objections and stayed the case for sixty days to allow Plaintiff to obtain counsel and to comply with the MPLA and amend his Complaint. (ECF No. 35) Accordingly, for the sake of simplicity, the Procedural History provided herein will begin from entry of the District Court's Memorandum Opinion and Order to address the issues that were not dismissed.

[7] On July 9, 2018, Plaintiff informed the Court that he attempted to "find representation from 8 additional sources", however none would represent Plaintiff in this action, therefore Plaintiff wished to proceed pro se. (ECF No. 38 at 1)

("MPLA")[8] and returned this matter to the active docket. (ECF No. 39) That same day, the Court issued an Order and Notice pursuant to Local Rule of Civil Procedure 16.1. (ECF No. 40) On August 12, 2018, Defendant filed its Answer to the Complaint. (ECF No. 42) On August 13, 2018, the Court entered a Scheduling Order. (ECF No. 43)

After having completed discovery, pursuant to the Court's Scheduling Order, on May 17, 2019, Defendant filed its Motion to Dismiss for Lack of Subject Matter Jurisdiction and/or for Summary Judgment Against Plaintiff's Claims Relating to George Murphy, M.D. and Memorandum in Support of same. (ECF Nos. 58, 59) In support of this Motion, Defendant attached several exhibits: an Affidavit of Debbie Denningmann of Jackson & Coker Locum Tenens, LLC (ECF No. 58-1); the Declaration of Nancy Bailey (ECF No. 58-2); the Declaration of Donna Kenneda (ECF No. 58-3); and a letter dated October 11, 2018 from Dennis J. Stockwell, General Counsel for Jackson & Coker to counsel for Defendant (ECF No. 58-4). On the same day, Defendant also filed its Motion for Summary Judgment and Memorandum in Support of same. (ECF No. 60, 61) In support of this Motion, Defendant attached two exhibits, the Affidavit of Fred D. Lublin, M.D. and the Declaration of Gordon Sze, M.D. (ECF Nos. 60-1, 60-2)

On June 17, 2019, Plaintiff filed his Opposition and a Memorandum of Law (ECF Nos. 63, 64) in response to Defendant's Motions in compliance with the Court's <u>Roseboro</u> Notice/Order. (ECF No. 62) On June 19, 2019, Plaintiff also filed a Motion for Summary Judgment (ECF No. 65) and attached several exhibits in support: a copy of "VHA Directive 1101.06" dated April 14, 2017 concerning the "Multiple Sclerosis System of Care" (ECF No. 65-1); a copy of the VA Multiple Sclerosis Centers of Excellence of the Veterans Health Administration, Program Guide, dated June 28, 2018, concerning the "Multiple Sclerosis System of Care Procedures" (ECF No.

---

[8] Pursuant to W. Va. Code § 55-7B-1 *et seq.*

65-2); a copy of the VA MS Centers of Excellence of the Veterans Health Administration, Consensus Statement, dated February 12, 2018, concerning the "VA Multiple Sclerosis Centers of Excellence Consensus Statement Relapse and Disease Management in Multiple Sclerosis" (ECF No. 65-3); a copy of pages from the VA Handbook 5005/17, Part II, Chapter 3, dated June 15, 2006 (ECF No. 65-4); and a copy of pages from the VA Handbook 5005/92, Part II, Chapter 3, dated January 5, 2018, concerning "appointments" (ECF No. 65-5).

On June 19, 2019, Defendant filed its Motion to Strike Plaintiff's Motion for Summary Judgment (ECF No. 65) for Failure to Comply with the Court's Scheduling Order, the Federal Rules of Civil Procedure, and the Local Rules of This Court and Memorandum in Support of same. (ECF Nos. 66, 67) Subsequently, on June 21, 2019, Defendant also filed its Motion to Strike Plaintiff's Memorandum of Law in Support of its Opposition to Defendant's Motion to Dismiss and for Summary Judgment (ECF No. 64) for Violating L.R.Civ.P.7.1(a)(2) and accompanying Memorandum in Support. (ECF Nos. 68, 69) On June 24, 2019, Defendant filed the Declaration of Jeremiah Boring Filed in Further Support of Defendant's Motion to Dismiss (ECF No. 58) and for Summary Judgment (ECF No. 60) (ECF No. 74) and Reply of the Defendant United States of America to Plaintiff's Memorandum of Law in Support of its Opposition (ECF No. 75) pursuant to this Court's <u>Roseboro</u> Notice/Order (ECF No. 62). On June 24, 2019, Plaintiff filed his Opposition to Defendant's Motion to Strike (ECF No. 76) with supporting Memorandum of Law (ECF No. 77), as well as a Motion to Strike all of Defendant's Submissions to the Court Pertaining to Its Interpretation of the FTCA and the Defining Terms Within Based on Common Law Fraud (ECF No. 78) and its supporting Memorandum of Law (ECF No. 79). On June 26, 2019, Defendant filed its Memorandum in Opposition to Plaintiff's Motion to Strike All of Defendant's Submissions to the Court Pertaining to Its Interpretation of the FTCA and the Defining Terms

Within Based on Common Law Fraud (ECF No. 85) and attached copies of the decisions of the

United States Supreme Court in United States v. Orleans, 425 U.S. 807, 813-814 (1976) and of the

Fourth Circuit in Berkman v. United States, 957 F.2d 108, 111 (4th Cir. 1992) as supporting

exhibits (ECF Nos. 85-1, 85-2). [9]

Accordingly, this matter is fully briefed and ready for resolution.

**Defendant's Argument in Support of Motion to Dismiss
for Lack of Subject Matter Jurisdiction and/or for Summary Judgment
Against Plaintiff's Claims Relating to George Murphy, M.D.**

Defendant asserts that Dr. Murphy was never an employee of the BVAMC, but operated

as an independent contractor and was recognized as an independent contractor by both the

BVAMC as well as Jackson & Coker LocumTenens, LLC ("Jackson & Coker"), the firm the

BVAMC had a contract with for providing radiology services to the BVAMC. (ECF No. 59 at 1-

3) Because Dr. Murphy was an independent contractor, and independent contractors are not

governed under the FTCA, the United States has not waived its sovereign immunity and is not

liable for any tortious conduct alleged against Dr. Murphy. (Id. at 3-4) The contract in this case,

as well as the fact that Jackson & Coker had to provide medical professional liability insurance for

Dr. Murphy are other strong indicators that he was an independent contractor. (Id. at 4-6)

Under Wood v. Standard Products Co., 671 F.2d 825, 829 (4th Cir. 1982), the facts

demonstrate that Dr. Murphy was an independent contractor: the BVAMC, and by extension, the

United States, did not exercise control over Dr. Murphy with respect to his medical judgment,

specifically, his interpretation of radiology studies (Id. at 7-8); the contract itself explicitly states

that Jackson & Coker's contract radiologists, like Dr. Murphy, were not intended to be covered

---

[9] On June 25, 2019, Plaintiff filed an Objection to Defendant's Supplemental Response to Plaintiff's First Set of
Interrogatories to Defendant. (ECF No. 81) It does not appear that this pleading is related to or has any bearing on the
issues discussed herein, however.

under the FTCA and that such personnel were independent contractors (Id. at 9); the BVAMC contract with Jackson & Coker provided that the BVAMC paid for Dr. Murphy's radiology services directly to Jackson & Coker, and that Jackson & Coker itself provided for Dr. Murphy's compensation, tax withholdings, and other benefits. (Id. at 9-10)

These facts support dismissal of Plaintiff's claims against Defendant because Dr. Murphy was an independent contractor and Defendant is not liable for any torts he may have committed regarding Plaintiff. (Id. at 11)

### Plaintiff's Response

Plaintiff does not contest that Dr. Murphy was not a civil employee of Defendant, however, he asserts that under 28 U.S.C. § 2671 and 38 U.S.C. §§ 7401, 7405(a)(2) as well as the BVAMC's own VA Form 10-2543, Defendant appointed Dr. Murphy as an employee, and held Dr. Murphy out as an employee covered under the FTCA. (ECF No. 64 at 7-15) Plaintiff alternatively argues that should the Court determine that Dr. Murphy was an independent contractor, then Defendant should be held liable under the Health Insurance Portability and Accountability Act (HIPAA) because it permitted Dr. Murphy access to Plaintiff's personal information and health records when Plaintiff did not authorize any such release of same to Dr. Murphy or to Jackson & Coker. (Id. at 15-16)

Next, Plaintiff contends the clear unambiguous language of 28 U.S.C. § 2671 and 38 U.S.C. §§ 7401, 7405(a)(2) establishes that Dr. Murphy was an employee of the United States, and since there is no express waiver of liability, Defendant is therefore liable for Dr. Murphy's acts. (Id. at 16-20)

Under the Wood factors, Plaintiff asserts that Dr. Murphy is not an independent contractor: (1) his appointment as a contract physician pursuant to 38 U.S.C. § 7405 is demonstrated by VA

Form 10-2543[10]; (2) Dr. Murphy was contracted to provide outpatient and inpatient care, as was being held out as an employee because he was an "on-station fee-basis employee"; (3) Defendant dictated via Joyce E. Keaton, the Contracting Officer's Technical Representative, the manner and standard of the services Dr. Murphy provided, which are identified and measured pursuant to the Veterans Health Administration, Dr. Murphy was required to attend training that was compliant with the Veterans Health Administration, Dr. Murphy's duties were assigned on a rotational basis and were recorded via monthly reports to ensure he was performing as expected and for potential audits, and excerpts from Plaintiff's medical records show Dr. Murphy was a verifier and primary interpreter of his radiology imagery indicating he was a civil service employee staff member; (4) all prescriptions and supplies were controlled by Defendant, not Dr. Murphy; (5) Dr. Murphy could not make a referral without Defendant's approval, Defendant had authority over any referrals; (6) Dr. Murphy had delineated office hours and work times, just as any other civil service employee; (7) Defendant provided Dr. Murphy's office space, equipment, materials, supplies and support staff; (8) Dr. Murphy provided 100% of his services or total practice to activities designated by Defendant; (9) Dr. Murphy was required to sign in and out upon completion of his workday just like any civil service employee, was paid an hourly rate similar to a civil service employee, and his timecard was authorized by Ms. Keaton on a weekly basis for certification of payment due to Dr. Murphy's on-station fee basis appointment under 38 U.S.C. § 7405; (10) Dr. Murphy was not required to maintain records of his services, however, Defendant did so in compliance with Veterans Health Administration's public health services records; (11) Dr. Murphy did not authorize or verify patient eligibility for treatment, as this was provided by Defendant; (12) the

---

[10] Though not attached to the pending motions, Plaintiff refers to an earlier exhibit attached in his "Memorandum of Objections to the Proposed Findings and Recommendations to the District Judge Regarding Defendant's Motion to Dismiss" filed on November 13, 2017. (ECF No. 32 at 15-16; see also ECF No. 33-1 at 5-6)

Public Health Service did not review Dr. Murphy's employment with Defendant, Defendant provided reviews, evaluations, and documented same; and (13) Defendant provided Dr. Murphy with an orientation, training on electronic medical record systems, as well as other training updates of BVAMC policies, procedures, and processes provided to all civil service employees[11], and exercised the sole discretion to terminate Dr. Murphy's contract for non-performance or inadequate performance; (14) Defendant required Dr. Murphy to sign all the agreements concerning access to printed or electronic files containing sensitive information in the performance of official duties and Dr. Murphy was responsible for protecting same from unauthorized release and to follow applicable regulations of BVAMC policy; (15) Defendant required Dr. Murphy to undergo a National Agency Check and Inquiry background investigation prior to the performance of his contract, which is the same as required of all civil service employees. (Id. at 20-33)

Plaintiff states that Defendant itself provided the documentation and submissions that comport with the Wood factors, which underscores Dr. Murphy's appointment as a contract physician was no different from any other employee of Defendant. (Id. at 33)

Plaintiff next addresses various Declarations[12] that were submitted in this action, and states that Brian D. Edens would not have located information concerning Dr. Murphy in the VA/OPM database because Dr. Murphy was not selected under the civil service for employment, he was appointed as a contractor pursuant to 38 U.S.C. § 7405. (Id. at 33-34) With regard to the Declaration of Joyce E. Keaton, Plaintiff contends that Ms. Keaton stated that "[u]ntil the BVAMC

---

[11] Plaintiff asserts that he personally went through orientation as a civil service employee at the BVAMC and is familiar with what is involved, including the training for use of government information systems which are a primary component to the orientation. (ECF No. 64 at 32)

[12] Plaintiff refers to certain "Declarations" that were not attached as exhibits to the pertinent pending motions, however, it is noted that Plaintiff may be referring to exhibits that were submitted earlier in this action, such as the "Declaration of Brian D. Edens" (ECF No. 10 at 7; ECF No. 17-1 at 5), the "Declaration of Joyce E. Keaton" (ECF No. 10 at 9), and the "Declaration of Daphne P. Jackson" (ECF No. 10 at 10). Nevertheless, the undersigned has examined Plaintiff's arguments considering these references.

hired full time radiologist, the radiology services at the BVAMC were provided by independent contractors" these contractors were still required to perform the duties as any other civil service employee. (Id. at 34) With regard to the Declaration of Daphne P. Jackson, Plaintiff asserts that contrary to Ms. Jackson's statement that the BVAMC's purged records of its contract with Dr. Murphy would have contained an indemnification clause, because he was appointed under 38 U.S.C. § 7405, any such indemnification is voided. (Id. at 34-35) Further, because Dr. Murphy's duties were prescribed and dictated by the BVAMC, this shows that he was under Defendant's requirements of how to perform his duties, not under the authority of Jackson & Coker. (Id. at 35)

Regarding the Declaration of Donna Kenneda, Plaintiff argues that her statements attempt to discredit the claims of Drs. Berryman and Cappiello, both of whom opined that Defendant provided substandard care to Plaintiff. (Id. at 36) Plaintiff further disputes that the liability insurance policy obtained by Jackson & Coker on behalf of Dr. Murphy does not protect Defendant from liability for his actions because of his appointment under 38 U.S.C. § 7405. (Id. at 39) This appointment negates the insurance policy, because Dr. Murphy is covered under the FTCA. (Id. at 40)

Regarding the Declaration of Nancy Bailey, Plaintiff disputes there was an official offer by Jackson & Coker to enter into a contact with the BVAMC for Dr. Murphy because the VA Form-18 (signed by Jackson & Coker's Director of Government Healthcare Randy Weikle) explicitly states that these forms "are not offers", but are requests for information and quotations. (Id. at 37) The lack of proof of an "offer" is buttressed by the letter from Jackson & Coker's General Counsel, Dennis J. Stockwell, which provides that no documents could be located that confirmed the assumption of the contract for Dr. Murphy. (Id. at 37-38) Plaintiff asks the Court to strike any documentation pertaining to an accepted offer for Dr. Murphy's services because there

is no viable evidence of same. (Id. at 38)

Finally, Plaintiff disputes the accuracy of the documents referred to in the letter from Mr. Stockwell, stating that there is no evidence that Defendant made an award of a contract to JC Nationwide or an offer was made from JC Nationwide to Defendant given the dates of the documents and the representations made in Mr. Stockwell's letter concerning Jackson & Coker's purchase of JC Nationwide assets. (Id. at 40-41)

In sum, Plaintiff contends that when Defendant appointed Dr. Murphy under 38 U.S.C. § 7405, he was covered by the FTCA as any other VA employee and that he was expected to render services specified on a daily basis under BVAMC authority, and that the BVAMC held Dr. Murphy out as an employee. (Id. at 52) Defendant dictated Dr. Murphy's hours and training and provided his office, equipment, materials, supplies and support staff. (Id. at 53) Documents show that BVAMC personnel signed off on Dr. Murphy's appointment as an employee position as an on-station fee/per diem staff member that further establishes Dr. Murphy was an employee of the government envisioned by 28 U.S.C. § 2671. (Id.)

In reply, Defendant submitted the Declaration of Jeremiah Boring, the Assistant Chief of Human Resources at the BVAMC, a sworn statement confirming the independent contractor status of Dr. George Murphy. (ECF No. 74) Defendant contends that long-standing law in this Circuit and District has established that Plaintiff bears the burden of proving that the independent contractor exception does not apply in this case. (ECF No. 75 at 1) Moreover, despite Plaintiff's assertions to the contrary, Defendant has properly employed the independent contractor exception and that Dr. Murphy never received or accepted a formal appointment under 38 U.S.C. § 7405. (Id. at 2-5) Defendant further argues that Plaintiff's argument that Dr. Murphy was an appointed employee of the BVAMC is mere speculation, as Mr. Boring's sworn statement and Ms. Keaton's

note show that Dr. Murphy was under contract with J&C, and not an employee of BVAMC. (Id. at 6) Even if Dr. Murphy was appointed mistakenly, this does not render him a federal employee. (Id.) Under the factors provided by Wood v. Standard Products Co., Inc., 671 F.2d 825 (4th Cir. 1982) and the precedent set by Robb v. United States, 80 F.3d 884 (4th Cir. 1996) and their progeny, it is clear that Dr. Murphy was an independent contractor. (Id. at 6-14)

**Defendant's Argument in Support of Motion for Summary Judgment**

Defendant points out that Plaintiff has claimed medical negligence against Dr. Gary Harpold, Dr. William Tingler, Dr. Jung Lee, Dr. George Murphy and Nurse Practitioner Ann Lilly. Because Dr. Harpold and Dr. Tingler were neurologists at the Salem Veterans Administration Medical Center ("SVAMC") in Salem, Virginia, Virginia law applies, Dr. Lee, Dr. Murphy and Ms. Lilly provided services at the BVAMC, therefore West Virginia law applies. (ECF No. 61 at 1-2) Under either law, Plaintiff must prove by expert witness testimony that there was a breach in the standard of care and that breach was the proximate cause of Plaintiff's injuries. (Id. at 2-3) Because Plaintiff has failed to present such expert testimony, his claims fail. (Id. at 4)

Defendant has presented expert witness opinions that establish there was no deviation in the standard of care that caused Plaintiff's injuries. (Id.) For starters, Dr. Fred D. Lublin is a licensed physician in New York and Pennsylvania, board certified in neurology, and a professor of neurology at Mount Sinai School of Medicine and the Director of the Corinne Goldsmith Dickinson Center for Multiple Sclerosis at the Mount Sinai School of Medicine. (Id.) Dr. Lublin specializes in treating patients with multiple sclerosis. (Id.) As shown in his Affidavit, Dr. Lublin has reviewed several records and documents concerning Plaintiff, including his Beckley VA records, his Salem VA records, the Vaught Neurological records, his Richmond VA records, Plaintiff's Veteran's Claim Folder C, Plaintiff's November 22, 2013 Claim and appeal, the

statements provided by Drs. Berryman and Cappiello, Plaintiff's responses to Interrogatories,

Plaintiff's med lists, Plaintiff's Complaint, the Velazquez Dermatology Associates records,

Plaintiff's Walter Reed records, Plaintiff's Ohio Health records, as well as multiple MRI scans.

(Id. at 5; ECF No. 60-1 at 79) After Dr. Lublin's review of several records which spanned years

of treatment, he concluded that based upon a reasonable degree of medical certainty:

> Mr. Sumpter was found to have early MS while in the service. He subsequently
> came under the care of the VA. There he was followed with fluctuating symptoms
> attributed to Uhthoff's phenomenon, which I believe was correct. He had several
> MRIs from 2006 to 2008 which were read as normal, but which had lesions
> consistent with a diagnosis of MS, but were relatively stable. During this period,
> his neurological exam was also stable. He was not put onto an MS disease-
> modifying agent, Betaseron, until 2011. *His neurological examination remained*
> *stable as assessed by several neurologists through 2013, including the period*
> *after starting Betaseron. By late 2013, [Plaintiff's] symptoms had worsened and*
> *soon thereafter his exam also worsened. This led to changing his medications.*
> *After switching to Lemtrada in late 2016, his MS seems to have stabilized.*
>
> While one could argue as to whether Mr. Sumpter should have been treated earlier
> with a disease-modifying agent, and if the MRIs had been read correctly, he may
> have. *However, review of his clinical course reveals that he remained relatively*
> *stable throughout the earlier period and his MS did not start to worsen until after*
> *he had been on therapy for some time. There is no delayed effect of not starting*
> *medication earlier based on the stability of his examinations and MRI scans. MS*
> *is an unpredictable disease that can remain stable, even untreated, for long*
> *periods of time. Mr. Sumpter's course is not atypical in this regard. Based on my*
> *review of the records, with a reasonable degree of medical certainty, it is my*
> *opinion that even if a deviation from the standard of care or negligence had*
> *occurred, any such deviation did not result in injury to Mr. Sumpter.*

(Id. at 5-6; Id. at 83-84) (emphasis in original).

Defendant argues that according to Dr. Lublin, any alleged delay in starting disease-

modifying therapy did not cause Plaintiff any injury because his neurological condition was stable

while he was not on that therapy, and that his condition only worsened after he had been on that

therapy for some time, and there is no delayed effect from not starting that therapy earlier. (Id. at

6) Defendant provides additional excerpts from Dr. Lublin's opinion:

14

I have been informed that Mr. Sumpter has claimed that the following persons were negligent in this case: (1) radiologist George B. Murphy, M.D., who interpreted certain radiological studies in 2006 and 2007; (2) Gary Harpold, M.D., a neurologist from the Salem VAMC, who saw Mr. Sumpter in 2007 and 2008; (3) William Tingler, M.D., a radiologist from the Salem VAMC, who saw Mr. Sumpter on one occasion in January, 2013 (Mr. Sumpter was already being treated by a neurologist outside the VA system and was on Betaseron, a disease-modifying therapy for multiple sclerosis at the time he was seen by Dr. Tingler); (4) Ann Lilly, a family nurse practitioner at Beckley VAMC, who saw Mr. Sumpter in 2006 through 2009 and (5) Jung K. Lee, M.D., a primary care physician at Beckley VAMC, who approved Mr. Sumpter for Betaseron, a disease-modifying therapy for multiple sclerosis and also approved Mr. Sumpter to be treated and evaluated by a neurologist outside the VA system. It is also my understanding that Mr. Sumpter is alleging that an alleged delay in starting disease-modifying therapy has caused him injury.

I saw no evidence that Dr. Harpold, Dr. Tingler, Ms. Lilly or Dr. Lee did anything which caused an injury to Mr. Sumpter. Again, as I expressed in my report, I saw no deviations from the standard of care by these individuals which caused any injury to Mr. Sumpter. His neurological condition remained stable during the time that these individuals had contact with Mr. Sumpter. While Mr. Sumpter did have some fluctuating symptoms caused by Uhthoff's phenomenon (a phenomenon where increases in body temperature from hot weather, exercise, fevers, and exposure to heat can cause a temporary worsening of multiple sclerosis symptoms) during the time that these providers saw Mr. Sumpter, his symptoms were properly treated and his neurological condition with regard to multiple sclerosis remained stable. Mr. Sumpter's symptoms began to worsen in late 2013, well after he saw Dr. Tingler, and well after he had been started on disease-modifying therapy to treat and manage his multiple sclerosis.

While I disagree with Dr. Murphy's interpretation of certain radiology studies of Mr. Sumpter's brain performed in 2006 and 2007, his interpretations of those studies did not cause any injury to Mr. Sumpter. Mr. Sumpter's neurological condition remained stable during that period of time and for a period of time after Mr. Sumpter started disease-modifying therapy for his multiple sclerosis. Mr. Sumpter was placed on Betaseron, a disease-modifying therapy, by his private neurologist, Dr. Othman, in 2011, to treat his multiple sclerosis. Mr. Sumpter's other private neurologists have also treated him with other disease-modifying therapies. ***His multiple sclerosis remained stable until late 2013. At that time, his multiple sclerosis began to worsen, and his treating physicians changed his disease-modifying therapy. Mr. Sumpter has been treated with Lemtrada, another disease-modifying agent, and his multiple sclerosis appears to have been stable since 2016 based on the records I have reviewed.***

***As I stated in my report, multiple sclerosis is an unpredictable disease that can remain stable, even untreated, for long periods of time. Although Mr. Sumpter***

> *did not start disease-modifying therapy until 2011, any alleged delay in starting that therapy has not caused him any injury. His neurological condition only began to worsen in late 2013 after he had been treated with various disease-modifying therapies. There is no indication that his condition would be any different if he had started disease-modifying therapy earlier since he was neurologically stable prior to starting disease-modifying therapy.*

> Based on my education, training, and experience as a board certified neurologist, I hold all of the opinions in this affidavit and my report attached as Exhibit B to a reasonable degree of medical certainty.

(Id. at 6-8; Id. at 4-6)

Next, Defendant proffers the opinion of Dr. Gordon Sze, a Professor of Radiology at Yale University School of Medicine who has served as Chief Neuroradiology for 30 years with numerous accomplishments and accolades, including over 100 peer reviewed publications listed in his curriculum vitae. (Id. at 8) Defendant asserts that Dr. Sze specializes in interpreting neuroimaging studies focusing on the diagnosis and characterization of abnormalities of the brain, spine, and neck. (Id.) Defendant states that Dr. Sze reviewed Plaintiff's medical records from the BVAMC and SVAMC as well as the imagining studies performed on his brain and spine, and after his review, Dr. Sze made the following findings and conclusions:

> Case specific findings

> Joshua Sumpter has undergone many imaging examinations from 2006 to 2018. These studies document findings typical of multiple sclerosis. His earliest MR examinations demonstrate plaques in the white matter and in the brainstem.

> Despite the allegations of progression of disease in this case, Mr. Sumpter's imaging examinations demonstrate that his disease was well-controlled during the multi-year period in question. During the entire span of time from 2006 till the final MR examination currently available for review, in 2018, there are no clear new lesions. In fact, during this time interval, several lesions, especially in the brainstem, become less visible. In addition, during this entire span of time, there are no lesions that demonstrate contrast enhancement or restricted diffusion. Furthermore, it should be noted that the MR examinations of his spine never disclose lesions in his spinal cord. **Therefore, in opposition to the allegations in this case, Mr. Sumpter's disease appears to have been very well-controlled during the entire period of time in which MR examinations are available for**

16

review.

CONCLUSIONS

***In conclusion, within a reasonable degree of medical certainty, the imaging examinations of Joshua Sumpter demonstrate stability of his multiple sclerosis. Within a reasonable degree of medical certainty, the findings on the imaging examinations of Joshua Sumpter during the entire period of time in which MR examinations are available for review, from 2006 to 2018, remain essentially unchanged or even improved. Within a reasonable degree of medical certainty, the imaging examinations of Joshua Sumpter contradict the allegation that his disease was progressing.***

(Id. at 9-10; ECF No. 60-2 at 65-66) (emphasis in original) Defendant contends that it has presented considerable admissible evidence from highly qualified experts that any alleged deviations from the standard of care as alleged by Plaintiff did not proximately cause him injury.

Defendant further argues that the Affidavit provided by Dr. Lublin and the Declaration provided by Dr. Sze meet Rule 56 of the Federal Rules of Civil Procedure requirements for summary judgment, and points out that Plaintiff has only provided certificates of merit to support his claim, which are not admissible as a matter of law as well as insufficient to oppose a motion for summary judgment. See W. Va. Code § 55-7B-6(j); Pauley v. Veterans Administration Medical Center, 2007 WL 9718621, at *2 (S.D.W.Va. 2007). (Id. at 10-11)

Defendant argues that it has demonstrated ample support for its Motion for Summary Judgment and asks this Court to grant same. (Id. at 12)

**Plaintiff's Response**

Plaintiff argues that he became aware of his injuries after he applied for a disability increase due to the progression of his disease on November 22, 2013. (ECF No. 64 at 41) After the initial denial of his claim, Plaintiff attempted numerous times to ascertain the status of his reconsideration request but never heard from the same responding official and was redirected to a different VA attorney after having been made to recount his claim in detail in each time he had to reply to

17

another VA attorney. (Id. at 42) Plaintiff states the final denial is dated March 16, 2016 and contends that his claim is timely. (Id. at 42-43)

Plaintiff states that in 2001 Congress urged the Veterans Health Administration to establish two Multiple Sclerosis Centers of Excellence ("MSCOE") resulting in two centers being established after receiving competitive applications in Baltimore, Maryland and a joint center in Seattle and Portland. (Id. at 43-44) The purpose of MSCOE is to provide improved quality care and consistent health care for veterans with MS. (Id. at 44-46) However, Plaintiff argues that after being temporarily retired from the U.S. Army in July 2006, he was directed to seek treatment for MS at the closest VA facility near him, which was the BVAMC. (Id. at 46) The BVAMC failed to properly care for his MS, though Plaintiff received a 30% disability rating because it was a service-connected disease. (Id.) The BVAMC did not employ the protocols adopted by MSCOE and Plaintiff should have been placed on the MSCOE registry, or even referred to the closest MSCOE. (Id.) Although the BVAMC referred Plaintiff to the Salem VA, there was no established continuum of care for his MS and he did not receive adequate care as established by MSCOE, specifically because his BVAMC and Salem VA providers were not knowledgeable about treating this disease. (Id.)

Plaintiff asserts that the policies and procedures for health care services for veterans with MS was established by the VHA Directive 1011.06.[13] (Id. at 47) Plaintiff did not receive the high quality subspecialty MS care as established by the Veterans Health Administration, but only received "routine primary care" and sometimes non-multiple sclerosis specialty care at non-VA facilities for an approved three visits in order to obtain a prescription for DMT. (Id. at 48) Plaintiff contends that his diagnosis rendered him an appropriate candidate for DMT, but the BVAMC

---

[13] Plaintiff subsequently filed exhibits to support his own Motion for Summary Judgment that describe these alleged policies and procedures. (See ECF Nos. 65-1, 65-2, 65-3, 65-4, 65-5)

deviated from the standard of care by delaying this treatment. (Id.) Defendant did not comply with its own directives and policies and deviated from its own established standard of care for Plaintiff's disease. (Id.)

With respect to the opinion of Dr. Lublin, Plaintiff contends that negligence had been proved by the medical record and that he was not provided the proper standard of care established by the Veterans Health Administration. (Id. at 49-50) Plaintiff argues that early treatment would have decreased the odds of disease advancement, and if his disease were stable, then he would have been granted re-entry into active duty. (Id. at 50-51) Plaintiff disputes Dr. Lublin's opinion that Plaintiff's symptoms stabilized and further asserts that Dr. Lublin's "opinion based on records of care that has in fact had the actual credibility questioned as it pertains to this claim is of no significant worth." (Id. at 51)

With respect to the opinion of Dr. Sze, Plaintiff argues that the readings of the imaging examinations were deemed erroneous by Drs. Cappiello, Berryman, and Lublin. (Id.) This shows that negligence occurred and Dr. Sze's determination of stability of Plaintiff's disease is unfounded, particularly where there is no way to predict the course of an individual's disease. (Id.) Plaintiff disputes Dr. Sze's opinion that the imaging records from 2006 to 2018 were unchanged or improved, and contends that his opinion contradicts the other expert witnesses stating that the disease was progressing from a radiological standpoint. (Id. at 51-52)

In sum, Plaintiff argues that Defendant's experts' opinions contradict the opinions provided by Plaintiff's own experts who are directly involved in his care and have personal first-hand knowledge of his disease and condition. (Id. at 53-54)

In reply, Defendant argues that Plaintiff failed to use competent evidence to oppose Defendant's Motions, and Plaintiff referred to unauthenticated documents in support of his claims.

(ECF No. 75 at 14-15) Specifically, Plaintiff's use of the guidelines and policies of the VA Centers for Excellence for Multiple Sclerosis and the conclusory opinions contained in his certificates of merit has already been determined by the Fourth Circuit that such unauthenticated documents are improper proof to oppose a motion for summary judgment. See, e.g., <u>Orsi v. Kirkwood</u>, 999 F.2d 86 (4th Cir. 1993). (<u>Id</u>. at 14-19)

In sum, Defendant contends that Plaintiff had ample time to properly prosecute his case, but has failed to submit competent and appropriate evidence to do so, and in accordance with this Circuit's precedent, asks the Court to grant its Motions. (<u>Id</u>. at 19-20)

### THE STANDARD

As noted *supra*, Plaintiff is acting *pro se,* therefore, the Court should liberally construe his pleadings. <u>Estelle v. Gamble</u>, 429 U.S. 97, 106 (1976); <u>Loe v. Armistead</u>, 582 F.2d 1291, 1295 (4th Cir. 1978). However, "[l]iberal construction does not require courts to construct arguments or theories for a *pro se* plaintiff because this would place a court in the improper role of an advocate seeking out the strongest arguments and most successful strategies for a party." <u>Miller v. Jack</u>, 2007 WL 2050409, at *3 (N.D.W. Va. 2007) (citing <u>Gordon v. Leeke</u>, 574 F.2d 1147, 1151 (4th Cir. 1978)). In other words, a court may not construct legal argument for a plaintiff. <u>Small v. Endicott</u>, 998 F.2d 411 (7th Cir. 1993). "Moreover, the requirement of liberal construction does not mean that the Court can ignore a clear failure in the pleadings to allege facts which set forth a claim currently cognizable in a federal district court." <u>Miller</u>, 2007 WL 2050409, at *3 (citing <u>Weller v. Department of Social Servs</u>., 901 F.2d 387 (4th Cir. 1990)).

Also noted *supra*, pending before the Court are several motions: ***Defendant's Motion to Strike Plaintiff's Motion for Summary Judgment (ECF No. 65) for Failure to Comply with the Court's Scheduling Order, the Federal Rules of Civil Procedure, and the Local Rules of this***

***Court*** filed on June 19, 2019 (ECF No. 66); ***Defendant's Motion to Strike Plaintiff's***

***Memorandum of Law in Support of its Opposition to Defendant's Motion to Dismiss and for***

***Summary Judgment (ECF No. 64) for Violating L.R.Civ.7.1(a)(2)***[14] filed on June 21, 2019 (ECF

No. 68); and ***Plaintiff's Motion to Strike All of Defendant's Submissions to the Court Pertaining***

***to Its Interpretation of the FTCA and the Defining Terms Within Based on Common Law Fraud***

filed on June 24, 2019 (ECF No. 78).

Regarding its first ***Motion to Strike*** (ECF No. 66), Defendant correctly points out that

Plaintiff filed his dispositive motion after the Court's imposed deadline of May 17, 2019 set forth

in the Scheduling Order entered on August 13, 2018. (ECF No. 67) In the Scheduling Order, the

Court explicitly stated: "PLEASE NOTE THAT ANY RESPONSE OR OTHER DOCUMENTS

FILED AFTER THE DEADLINE FOR FILING, WITHOUT LEAVE OF COURT, WILL NOT

BE CONSIDERED." (ECF No. 43 at 2-3) Defendant further contends that Plaintiff's Motion for

---

[14] Local Rule of Civil Procedure 7.1 concerns Motions Practice:
  (a)  Motions and Supporting Memoranda.

  (1)  General. All motions shall be concise, state the relief requested precisely, and be filed
       timely but not prematurely. Copies of depositions (or pertinent portions thereof),
       admissions, documents, affidavits, and other such materials or exhibits upon which the
       motion relief shall be attached to the motion, not the supporting memorandum.

  (2)  Length. A memorandum of not more than 20 pages in length must accompany the
       following types of motions: (1) to intervene; (2) to transfer; (3) to vacate; (4) to reconsider;
       (5) for rehearing; (6) for attorney fees; (7) for clarification; (8) to realign parties; (9) to
       consolidate; (10) to recuse; (11) to dismiss; (12) to remand; (13) for summary judgment;
       (14) for sanctions; (15) for default judgment; (16) for declaratory judgment; (17) to compel
       arbitration; (18) for injunctive relief or for a temporary restraining order; (19) for a new
       trial, to reconsider or to alter or amend judgment; (20) to reinstate or reopen a civil action;
       (21) to substitute party; (22) to stay; (23) to seal; or (24) to show cause.

       In addition to these motions, the court has discretion to direct a movant to submit a
       memorandum to accompany any other type of motion. If a movant deems appropriate, a
       memorandum of not more than 20 pages in length may accompany any other type of motion
       even if not required by this rule or the court. Any response and reply memoranda shall
       adhere to the same page limitation.

       Motions to exceed the page limitation will be denied absent a showing of good cause.
       If a memorandum is not submitted as required by this rule or by the court, the motion will
       be denied without prejudice.

Summary Judgment does not comply with Local Rule 7.1(a) because it did not have an accompanying memorandum of law, but was a "bare motion with some exhibits attached to the motion." (ECF No. 67 at 1) Defendant is also concerned that the briefing period on Plaintiff's untimely Motion may impede these proceedings as trial in this matter is scheduled for August 19, 2019. (Id. at 2)

In his ***Opposition*** (ECF No. 76), Plaintiff explains that he is a *pro se* litigant and is prosecuting his claim to the best of his abilities, without the benefit of a legal education or experience. Plaintiff asks the Court to consider his Motion for Summary Judgment; he does not believe its untimely filing will affect any trial dates. (Id.) Plaintiff apologizes for failing to provide a memorandum of law with his Motion for Summary Judgment, but asks the Court to consider this pleading as he only had limited time to review and reply to the "newly presented evidence" by May 17, 2019. (ECF No. 77)

With respect to Plaintiff's Motion for Summary Judgment (ECF No. 65), there is no question that this dispositive motion was filed over a month beyond this Court's deadline of May 17, 2019 without a prior request for leave of Court, and this Court unambiguously stated in its Scheduling Order that untimely filings will not be considered without obtaining prior leave of Court. Nevertheless, it appears that Plaintiff's reference to "newly presented evidence" conflates the deadline imposed for dispositive motions with the Court's deadline to respond to Defendant's Motions outlined in the Roseboro Notice/Order. (ECF No. 62) Further, it would appear that Plaintiff, being a self-proclaimed *pro se* litigant who does not have the benefit of legal representation or possesses the knowledge and experience to properly navigate legal proceedings and motions practice, may have misinterpreted or misunderstood the Court's directive to file

dispositive motions by May 17, 2019 which would not necessarily be the same thing as filing a response to Defendant's Motions.

Indeed, Plaintiff's Motion for Summary Judgment (ECF No. 65) is as described by Defendant, a bare motion with some exhibits attached, which essentially provides a brief recitation of Plaintiff's arguments he previously set forth in his Memorandum of Law in Support of its Opposition to Defendant's Motion to Dismiss and for Summary Judgment (ECF No. 64). To that extent, Plaintiff's arguments as presented in his Motion for Summary Judgment are not untimely, but under the jurisprudence governing a court's treatment and consideration of *pro se* pleadings, the Court would nevertheless consider the arguments reasserted in Plaintiff's Motion for Summary Judgment. However, as discussed *infra*, because there are genuine issues of material fact in this case and given the unique presentation of this *pro se* medical malpractice case, the undersigned **RECOMMENDS** that ***Plaintiff's Motion for Summary Judgment*** (ECF No. 65) be **DENIED**, and further **RECOMMENDS** that ***Defendant's Motion to Strike Plaintiff's Motion for Summary Judgment (ECF No. 65) for Failure to Comply with the Court's Scheduling Order, the Federal Rules of Civil Procedure, and the Local Rules of this Court*** (ECF No. 66) be **DENIED** because striking Plaintiff's Motion for Summary Judgment is of no moment.[15]

In its next ***Motion to Strike*** (ECF No. 68), Defendant again correctly points out that Plaintiff filed a lengthy, fifty-four-page Memorandum of Law without requesting leave of Court first. (ECF No. 69) Under the auspices of the jurisprudence concerning *pro se* litigants, this Court would normally be disinclined to strike Plaintiff's Memorandum of Law because a less stringent

---

[15] On June 24, 2019, the Court entered its First Amended Scheduling Order and provided a new deadline specifically for filing Motions *in Limine* (August 30, 2019) as well as continued the pretrial conference to October 17, 2019 with a new trial date of October 28, 2019. (ECF No. 80) Obviously, the new pretrial and trial dates would obviate Defendant's concerns with the briefing schedule being impacted by Plaintiff's belated filing. Nevertheless, certain deadlines must be enforced, otherwise, the motions practice could continue indefinitely and impair the efficiency of judicial resolution of this civil action.

standard applies in this case. The Court should therefore consider Plaintiff's arguments contained in his Memorandum of Law in Support of its Opposition to Defendant's Motion to Dismiss and For Summary Judgment (ECF No. 64), accordingly, the undersigned **RECOMMENDS** that ***Defendant's Motion to Strike Plaintiff's Memorandum of Law in Support of its Opposition to Defendant's Motion to Dismiss and for Summary Judgment (ECF No. 64) for Violating L.R.Civ.7.1(a)(2)*** be **DENIED**. (ECF No. 68)

Finally, in response to ***Plaintiff's Motion to Strike All of Defendant's Submissions to the Court Pertaining to Its Interpretation of the FTCA and the Defining Terms Within Based on Common Law Fraud*** (ECF No. 78), Defendant succinctly points out that it has cited, quoted and relied upon the application and interpretation of 28 U.S.C. § 2671 as set forth by the United States Supreme Court and the Fourth Circuit, therefore any allegations of fraud by Plaintiff are frivolous and without merit (ECF No. 85). The undersigned **RECOMMENDS** that ***Plaintiff's Motion to Strike All of Defendant's Submissions to the Court Pertaining to Its Interpretation of the FTCA and the Defining Terms Within Based on Common Law Fraud*** (ECF No. 78) be **DENIED**, as Defendant has clearly articulated sound legal arguments, and despite Plaintiff's arguments, it has not been demonstrated that Defendant has made false misrepresentations of law. In short, this is simple motions practice where opposing parties proffer different perspectives on what legal doctrine or statutes mean and/or how they are to be applied.

## DISCUSSION

### Timeliness of Claim

Plaintiff insists that he filed his administrative tort claim timely. The time for commencing a tort action against the United States is governed by 28 U.S.C. § 2401(b):

> A tort claim against the United States shall be forever barred unless it is presented in writing to the appropriate Federal Agency within two years after such claim

accrues or unless action is begun within six months after the date of mailing, by certified or registered mail, of notice of final denial of the claim by the agency to which it was presented.

Plaintiff had two years to file his FTCA claim with the BVAMC, or within six months of the notice of final denial of his FTCA claim. Generally, a tort claim accrues at the time of injury, but in medical malpractice cases, the limitations period does not begin to run until the plaintiff has discovered or should have discovered both the critical facts of the injury and its cause. United States v. Kubrick, 444 U.S. 111, 120, 122-123, 100 S.Ct. 352, 62 L.Ed.2d 259 (1979). The timeliness of this inquiry is measured by an objective standard – whether a reasonable person's suspicions of an injury would induce that individual to seek professional advice regarding legal recourse. Barren v. United States, 839 F.2d 987, 990 (3d Cir.1988) (citing Kubrick, 444 U.S. at 123-124). This definition does not extend the time of accrual until the plaintiff is aware that the injury was negligently inflicted and thus may constitute medical malpractice. Kubrick, 444 U.S. at 123.

The Supreme Court determined that time limitations under the FTCA were non-jurisdictional and were subject to equitable tolling. U.S. v. Kwai Fun Wong, 135 S.Ct. 1625 (2015). The party arguing that a statute of limitations should be equitably tolled bears the burden of proving "(1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way." Pace v. DiGuglielmo, 544 U.S. 408, 418, 125 S.Ct. 1807, 161 L.Ed.2d 669 (2005); see also Harris v. Hutchinson, 209 F.3d 325, 330 (4th Cir. 2000) ("[T]o invoke equitable tolling, [a party] must be able to point to some other extraordinary circumstance beyond his control that prevented him from complying with the statutory time limit."). This burden is significant, and the party advocating the tolling must demonstrate more than a "garden variety claim of excusable neglect." Irwin v. Dep't of Veterans' Affairs, 498 U.S. 89, 96 (1990). A *pro se* litigant's difficulty

understanding the law or prosecuting his case is not a proper basis for equitable tolling. See United States v. Sosa, 364 F.3d 507, 512 (4th Cir. 2004).

In this case, the parties agree on three dates, the first is that Plaintiff was diagnosed with MS in July 2006, the second is that Plaintiff was not placed on DMT until August 2011, and the third is that Plaintiff filed his FTCA claim on August 8, 2014. However, their disagreement is on whether Plaintiff timely filed: Plaintiff has alleged several dates when he discovered or should have discovered both the critical facts of the injury and its cause[16]; Defendant has alleged that Plaintiff received DMT in August 2011, therefore his FTCA claim is forever barred, since he did not file within two years. A timeline of the pertinent dates as alleged by Plaintiff are as follows:

- 2009 – Plaintiff alleges his vocational rehabilitation counselor, Darla Walden "attempted to intervene on my behalf by requesting medical services. She had become concerned with the care I was receiving . . . and witnessed first hand the difficulties I had been having." (ECF No. 2 at 10)

- August 2010 – Plaintiff alleges his primary care provider at the VA, Dr. Jung Lee, intended to send Plaintiff to the neurologist he had seen previously, Dr. Gary Harpold, at the Salem, Virginia VA. Plaintiff alleges Dr. Harpold did not offer the appropriate treatment. Plaintiff alleges Dr. Lee did not want to write a prescription until Plaintiff had seen three neurologists. (Id.)

- July 12, 2011 – Plaintiff alleges that he "was able to see Dr. Othman who educated Plaintiff on DMT this was the first time Plaintiff had been advised that DMT was the standard in MS treatment as it slows the progression on the disease. Dr. Othman was very concerned that Plaintiff had not been started on DMT. Dr. Othman that [sic] then stated use of DMT has been scientifically proven to decrease furtherance of disease symptomatology by up to seventy percent." (ECF No. 16 at 5) Defendant agrees with Plaintiff that he saw Dr. Joe Othman, who practices outside the VA system, and the date of that visit was July 12, 2011. (ECF No. 17 at 2; ECF No. 17-1 at 1-6)

- July 11, 2013 – Dr. Enrico Cappiello's interpretation of Plaintiff's MRIs. (ECF No. 2 at 16)

---

[16] Kubrick, 444 U.S. at 120, 122-123.

- 2013 – Plaintiff alleges his "discovery of fault of the VA in 2013 after review of MRIs and records." Plaintiff alleges he learned of the VA's negligence in 2013. (ECF No. 20 at 6)

- 2013 – Plaintiff alleges he learned of the VA's negligence in 2013. (ECF No. 21 at 5, 6)

- 2014 – Plaintiff alleges "It wasn't until 2014 that the Plaintiff was made aware as to the cause of the advancement of his disease." (ECF No. 20 at 5)

As noted *supra*, Plaintiff's allegations appear to support the argument that he was aware of his injuries for years before he began DMT. However, when Plaintiff discovered or reasonably should have discovered the alleged cause of his injuries, that is, the progression of his disease without DMT, is murkier. Arguably, Plaintiff, by his own admissions, learned of the substandard treatment afforded him at the Beckley VA on July 12, 2011 when he saw Dr. Othman, who informed him that DMT was the standard of care for MS. Defendant has argued that in August 2011, when Plaintiff received DMT, was when he was aware of his injury as well as its cause. If that date is accurate, then Defendant is correct in its assertion that Plaintiff's FTCA claims were foreclosed to him when he did not file his claim until August 8, 2014, nearly a year after the two-year statute of limitations expired.

However, Plaintiff has argued that he timely filed his Complaint because of 28 U.S.C. § 2401(b)'s provision allowing for tort claims to be filed "within six months after the date of mailing" of the notice of final denial of the claim by the VA. Plaintiff attached as an exhibit to his Memorandum of Points and Authorities a copy of a letter from the VA dated March 16, 2016.[17] (ECF No. 16-15 at 1-2) This letter is allegedly in response to Plaintiff's request for reconsideration submitted on or about September 11, 2015, to the VA's denial of benefits notice dated March 27,

---

[17] Of interest here is that the VA denied Plaintiff's claim for being untimely, but then reviewed his claim on the merits and determined there was no negligence in the standard of care he received at the BVAMC.

2015. (Id. at 12) In essence, Plaintiff takes the position that the VA's denial of his request to reconsider the previous denial of benefits is the "final denial" espoused in the aforementioned statute, and when he filed this action on September 16, 2016, exactly six months from the date of the "final denial", his lawsuit is therefore timely.

"The [FTCA] provides that a tort claim against the United States 'shall be forever barred' unless it is presented to the 'appropriate Federal agency within two years after such claim accrues' and then brought to federal court 'within six months after the agency acts on the claim.' U.S. v. Kwai Fun Wong, 135 S.Ct. at 1629. In Wong, "in each of the two cases we resolve here, the claimant missed one of those deadlines, but requested equitable tolling on the ground that she had a good reason for filing late." Id. Ultimately, the Supreme Court determined that courts may toll both FTCA's limitations periods, when circumstances warrant it. Id.

Since the Court recommitted this matter to the active docket, and permitted the parties to engage in further discovery to clarify the factual dispute as to when Plaintiff should have been aware of the alleged negligence and medical malpractice, it is apparent that the factual ambiguities persist. Because Plaintiff has alleged several dates when he became aware of not only his injury, but also the cause, this rises to a genuine question of material fact because reasonable persons can draw different conclusions from these allegations. See, Childers Oil Co., Inc. v. Exxon Corp., 960 F.2d 1265, 1272-1273 (4th Cir. 1992). On that narrow issue, the undersigned **FINDS** that when Plaintiff's claim accrued, and when the statute of limitations began to run, is a question of fact that cannot be resolved as a matter of law at this point in the proceedings, and therefore **RECOMMENDS** that to the extent Defendant disputes the timeliness of Plaintiff's claim, that Defendant's request for summary judgment (ECF No. 60) be **DENIED**.

## United States Employee vs. Independent Contractor

In moving to dismiss, or alternatively for summary judgment, Defendant maintains that federal law conclusively establishes that Dr. Murphy was an independent contractor, and further, in accordance with the exhibits filed in support of the Motion, the relationship between the BVAMC and Jackson & Coker[18] underscores the parties intent that Dr. Murphy was never an employee at the BVAMC, but an independent contractor. Plaintiff has asserted several times that he does not dispute the fact that Dr. Murphy was a contract employee, however, he insists that the implication of 28 U.S.C. § 2671 and 38 U.S.C. §§ 7401, 7405 nullifies Dr. Murphy's independent contractor status, and rendered him an employee of Defendant.[19]

The FTCA provides "a limited waiver of sovereign immunity, making the Federal Government liable to the same extent as a private party for certain torts of federal employees acting within the scope of their employment." United States v. Orleans, 425 U.S. 807, 813 (1976). The plain language of the FTCA precludes imputing liability for actions of independent contractors.[20] Wood v. Standard Products Co., Inc., 671 F.2d 825, 829 (4th Cir. 1982). Whether an individual is a government employee or an independent contractor is a question of federal law. Logue v. United

---

[18] Plaintiff appears to dispute the legitimacy of the contractual arrangement between the BVAMC and Jackson & Coker as Defendant's proffered exhibits indicate that the initial contractor was J&C Nationwide, Inc., however, Mr. Stockwell's correspondence to Defense counsel explained the discrepancy since Jackson & Coker obtained the previous contractor's assets due to bankruptcy. (ECF No. 58-4) Nevertheless, Plaintiff has not provided the Court with any evidence to dispute Defendant's allegations that Jackson & Coker obtained the J&C Nationwide contracts with the BVAMC or that Jackson & Coker maintain these business records, and there is no genuine dispute regarding the authenticity of these records. Accordingly, to the extent that Plaintiff asks the Court that such "contractual documentation" be "stricken from the record" (ECF No. 64 at 38), the undersigned would recommend the Court deny Plaintiff's suggestion. Further, for the sake of simplicity, the undersigned refers to Jackson & Coker as the contractor in this matter.

[19] While the undersigned is mindful of the definition of an "employee of the government" and the interplay with certain appointments of medical personnel within the Veterans Health Administration, however, Plaintiff's reliance on these statutes is misplaced to the extent that these laws do not necessarily trump Defendant's ability to retain the services of an independent contractor, nor do those laws redefine the terms of those contractual relationships. Plaintiff points to no case law that supports his position that the implication of these statutes automatically negate a contract for an independent contractor.

[20] "The FTCA, as a waiver of sovereign immunity, is strictly construed, and all ambiguities are resolved in favor of the sovereign." Robb v. United States, 80 F.3d 884, 887 (4th Cir. 1996) (citing United States v. Nordic Village, Inc., 503 U.S. 30, 33 (1992)).

States, 412 U.S. 521, 528 (1973). The Fourth Circuit has applied a "control test" to physician-contractors, stating: "only where the Government has the power under the contract to supervise a contractor's 'day-to-day operations' and 'to control the detailed physical performance of the contractor' can it be said that the contractor is an employee or agent of the United States within the [FTCA]." Wood, 671 F.2d at 829, 832. However, this does not mean "that a physician must always be deemed an independent contractor simply because of the necessity that a physician exercise independent professional judgment in providing medical treatment to his or her patients." Robb v. United States, 80 F.3d 884, 889 (4th Cir. 1996). Instead, the Fourth Circuit has held that a multitude of potentially relevant factors are to be considered in the application of the control test in the physician context. Those factors are:

> (1) that the physician under the contract was referred to as a "contract physician," (2) that the physician was to provide "outpatient" care, (3) general statements concerning the manner and quality of service required under the contract, (4) the lack of control by the government over the prescription of drugs and medical supplies, (5) the authority of the physician to make referrals, (6) contractual requirements for office hours and the ability of the physician to decline to see patients, (7) the physician's responsibility to provide office space, support staff, supplies, and equipment, (8) the percentage of the physician's total practice which was devoted to activities under the contract, (9) the nature of the compensation to the physician, including method (fee schedule) and rates (similar to the physician's usual fees), (10) [the alleged employer's] recordkeeping requirements, (11) prescribed methods of verifying patient eligibility for treatment, and (12) the extent of [the alleged employer's] review of the physician's offices.

Id., (citing Wood, 671 F.2d at 830 & n.10).

In consideration of these factors, the contract between the BVAMC and Jackson & Coker indicates that Dr. Murphy was intended by both parties to be a "contract physician"[21] and not a staff employee. (ECF No. 58-1) Significantly, both parties "agree that the contactor, its employees, agents, and subcontractors shall not be considered VA employees for any purpose" (Id. at 14) and

---

[21] The business documents maintained by Jackson & Coker, previously used by J&C Nationwide, uses the terms "contract radiologist", "contract physician", and "contract employee". (i.e., ECF No. 58-1 at 12)

further intended that "[c]ontractor employees are not covered by the Federal Tort Claims Act." (Id. at 16) (see also ECF No. 58-2 at 3, "Declaration of Nancy Bailey")

Regarding record keeping, the BVAMC established and maintained the records, having the "contractor's employee" sign in and sign out after completion of the day's work, "so that work can be certified for payment." (Id. at 17) "Payment for any leave, including sick leave, holiday or vacation time are the responsibility of the contractor." (Id.) Dr. Murphy's hourly rates were dictated by the "Schedule of Supplies/Services" (Id. at 7-8) and Jackson & Coker was to submit monthly invoices pursuant to the contract. (Id. at 15) "The contractor shall provide the following for these personnel: workers compensation; professional liability insurance; health examinations; income tax withholding; and social security payments." (Id.)

Plaintiff points out, correctly, that Dr. Murphy's office, work hours, support staff, equipment, etc. was provided by the BVAMC (Id. at 12, 13, 14, 15); that the BVAMC provided an orientation covering its policies, procedures and processes necessary to the functioning of the BVAMC as well as "education concerning life/safety training." (Id. at 16-17) However, the BVAMC did not control Dr. Murphy's professional judgments: "The Government may evaluate the quality of professional and administrative services provided, but retains no control over the medical, professional aspects of services rendered (e.g. professional judgments, diagnosis for specific medical treatment), in accordance with FAR 37.401(b)[22] (Nonpersonal Health Care Services)." (Id. at 16) Further, the BVAMC and Jackson & Coker "expressly agreed and understood that this is a nonpersonal services contract, as defined in the Federal Acquisitions Regulation (FAR) 37.101[23], under which the professional services rendered by the Contractor or

---

[22] See 48 C.F.R. § 37.401(b).

[23] Federal Acquisition Regulation 37.101 defines a "non-personal services contract" as "a contract under which the personnel rendering the services are not subject, either by the contract's terms or by the manner of its administration,

its health-care providers are rendered in its capacity as an independent contractor." (ECF No. 58-2 at 20) Indeed, Dr. Murphy's professional medical liability insurance policy was covered by Jackson & Coker, not Defendant. (ECF No. 58-3)

These collective facts, which are not in dispute, but are generally contested by Plaintiff as to how to characterize them and what legal effect that have on the issue at hand, nevertheless support a finding that Dr. Murphy was an independent contractor. See Kramer v. United States, 843 F.Supp. 1066, 1070 (E.D. Va. 1994) ("Payment from the government to a health care entity which in turn compensates the individual health care provider on its own terms is an indicator of independent contractor status."); Dutton v. United States, 621 Fed.Appx. 962, 965 (11th Cir. 2015) (negligence claims against the United States by radiologist hired by contractor to provide radiology services at VA facility barred under the independent contractor exception to the FTCA and sovereign immunity); Tyson v. United States, 2007 WL 1840078, at *2 (E.D. Mich. 2007), affirmed, 279 Fed.Appx. 334 (6th Cir. 2008) (negligence claims against the United States based on alleged negligence of radiologist contracted to provide radiology services at VA facility barred under independent contractor exception to the FTCA).

In short, "[a]t the end of the day, under the contracts and in practice, [Dr. Murphy] had the all the hallmarks of [an] independent contractor[], and [Plaintiff] has marshaled nothing substantial to overcome that conclusion." See McGhee v. U.S., 2014 WL 896748 (W.D. Va. March 6, 2014) (physicians contracted to provide services at the VAMC in Salem, Virginia held to be independent contractors pursuant to a contract between the VAMC and Locum Tenens.com, LLC, a physician staffing agency).

---

to the supervision and control usually prevailing in relationships between the United States and its employees." 48 C.F.R. § 37.101.

Accordingly, the undersigned **RECOMMENDS** that ***Defendant United States of America's Motion to Dismiss for Lack of Subject Matter Jurisdiction and/or for Summary Judgment Against Plaintiff's Claims Relating to George Murphy, M.D.*** be **GRANTED**.[24] (ECF No. 58)

## Summary Judgment

Summary judgment is appropriate under Federal Rule of Civil Procedure 56 when no genuine issue of material fact exists, and the moving party is entitled to judgment as a matter of law. Once the moving party demonstrates the lack of evidence to support the non-moving party's claims, the non-moving party must go beyond the pleadings and make a sufficient showing of facts presenting a genuine issue for trial. Celotex Corp. v. Catrett, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 - 87, 106 S.Ct.1348, 89 L.Ed.2d 538 (1986). All inferences must be drawn from the underlying facts in the light most favorable to the non-moving party. Matsushita, 475 U.S. at 587, 106 S.Ct. at 1356. Summary judgment is required when a party fails to make a showing sufficient to establish an essential element of a claim, even if there are genuine factual issues proving other elements of the claim. Celotex, 477 U.S. at 322-23, 106 S.Ct. at 2552-53. Generally speaking, therefore, summary judgment will be granted unless a reasonable jury could return a verdict for the non-moving party on the evidence presented. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

---

[24] To the extent Plaintiff argues that should Dr. Murphy be deemed a non-VA physician or a non-VA employee and has proffered his "motion" that the BVAMC should be held liable for penalties under the Heath Insurance Portability and Accountability Act (HIPPA) for disclosing his personal information to Dr. Murphy and/or Jackson & Coker (ECF No. 64 at 15-16), the undersigned recommends the "motion" be denied as this is an improper amendment to his pleading. The Court's Scheduling Order explicitly provides that such amendments "shall be completed no later than September 21, 2018." (ECF No. 43 at 1)

The facts and inferences to be drawn therefrom must be viewed in the light most favorable to the non-moving party. Shealy v. Winston, 929 F.2d 1009, 1011 (4th Cir. 1991). However, the non-moving party may not rely on beliefs, conjecture, speculation, or conclusory allegations to defeat a motion for summary judgment. Baber v. Hosp. Corp. of Am., 977 F.2d 874-75 (4th Cir. 1992). The evidence relied on must meet "the substantive evidentiary standard of proof that would apply at a trial on the merits." Mitchell v. Data General Corp., 12 F.3d 1310, 1316 (4th Cir. 1993).

Rule 56(c)(1)(A) of the Federal Rules of Civil Procedure provides that

> [a] party asserting that a fact cannot be or is genuinely disputed must support the assertion by: [] citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials[.]

Accordingly, the undersigned finds that the Exhibits attached to the parties' pleadings and references thereto may be properly considered for purposes of a motion for summary judgment.

Without question, there are genuine disputes of material fact presented in this case. As noted *supra*, Defendant has produced the sworn statements of two experts who opine that no negligence occurred, and even if there had been negligence, Plaintiff incurred no injury, given the capricious nature of his disease. In contrast, Plaintiff has produced the sworn statements from his treating physician and the former Chief of Staff at the BVAMC who both opine that his medical care and treatment at the BVAMC were negligent, and that he suffered adverse effects as a result. (ECF No. 38)

Defendant contends that Plaintiff's certificates of merit are not admissible pursuant to W. Va. Code § 55-7B-6(j), and as such, are insufficient to oppose a motion for summary judgment and should therefore be stricken per this Court's holding in Pauley v. Veterans Administration Medical Center, 2007 WL 9718621 (S.D.W.Va. Oct. 3, 2007). (ECF No. 61 at 11) Defendant

contends that Plaintiff did not serve Fed. R. Civ. P. 26(a)(2) disclosures and his certificates of merit do not suffice as replacements, and do not provide the required information under the Federal Rules. (Id., n.2) Defendant contends that Plaintiff's expert, Dr. John Berryman, the former director at the BVAMC, is a gynecologist and not qualified as an expert on neurological medical matters involving multiple sclerosis. (Id.) Defendant contends that Plaintiff's certificate of merit of Dr. Aaron Boster fails to include a curriculum vitae despite the indication that same was attached. (Id.) Defendant argues these certificates of merit contain only conclusory opinions without bases for same. (Id.) Defendant also contends that Plaintiff's reference to and reliance upon incompetent evidence, such as the unauthenticated documents in support of his claims, including Plaintiff's use of the guidelines and policies of the VA Centers for Excellence for Multiple Sclerosis, is insufficient to oppose Defendant's Motion for Summary Judgment. (ECF No. 75 at 15)

Defendant is not mistaken about these deficiencies. As an initial matter, the Court agrees with Defendant that Plaintiff's reliance on the unauthenticated documents concerning the Veterans Health Administration policies and procedures for the treatment of MS is misplaced and insufficient to rebut Defendant's Motion for Summary Judgment. However, with respect to the screening certificates of merit that Plaintiff has referred to and relied upon in his opposition to Defendant's Motion, the Court notes that in Pauley, both parties were represented by counsel. Since the onset of this civil action, Plaintiff has proceeded *pro se*, despite numerous attempts to obtain counsel, and has clearly attempted to comply with the Court's Orders and the requirements under law by providing the necessary documentation, including the screening certificates of merit, in order to prosecute his claim. As noted *supra*, this Court holds Plaintiff's pleadings to "a less stringent standard" than those drafted by attorneys. Haines v. Kerner, 404 U.S. 519 (1972).

Under the more liberal standard afforded to *pro se* litigants, this Court cannot ignore Plaintiff's initial pleadings which included Dr. Enrico Cappiello's conclusion that he suffered from "undiagnosed MS white matter disease from 2006 until 9/19/2012" (ECF No. 2 at 16) and Dr. John Berryman's letter dated May 21, 2014 that "if treatment with appropriate medications had been instituted in a timely fashion, Mr. Sumpter would not have the more advanced form of MS he is experiencing at present." (Id. at 17) This Court cannot ignore Plaintiff's certificates of merit are sworn statements provided by physicians who are personally familiar with Plaintiff's condition and his care:

First, Dr. Aaron Boster, is a board-certified clinical neuroimmunologist specializing in MS and is familiar with the standard of care for MS and licensed in Ohio, has reviewed the medical records, including but not limited to those from the VA, and has opined that Plaintiff "while under the VA care, was not afforded a disease modifying therapy for a period of 5 years or more" which was "below the standard of MS care" and this "deviation from the standard of care . . . resulted in the advancement of Mr. Sumpter's progressive phenotype of Relapsing & Remitting Multiple Sclerosis." (ECF No. 38 at 2) (emphasis in original); and

Second, Dr. John Berryman, despite being a specialist in Obstetrics and Gynecology, is familiar with the standard of care for MS, reviewed Plaintiff's medical records not necessarily limited to those from the VA, and opined "to a reasonable degree of medical certainty/probability that the standard of care was breached by the Department of Veterans Affairs while Mr. Sumpter was under their care for MS for several years. No disease modifying therapy was afforded to Mr. Sumpter for a period of five years or more." (Id. at 4) (emphasis in original). Dr. Berryman also concluded that "the deviation from the standard of care by the health care providers named above

resulted in the advancement of Mr. Sumpter's progressive phenotype of <u>Relapsing & Remitting</u> <u>Multiple Sclerosis</u>." (<u>Id</u>. at 5) (emphasis in original).

The fact that Dr. Boster is Plaintiff's treating physician (ECF No. 16-15 at 17-18)[25] is significant and whose opinions, as presented in the screening certificate of merit, present a genuine issue of material fact in this medical malpractice action. The fact that Dr. Berryman was the Chief of Staff at the BVAMC from April 2007 through March 2017 (ECF No. 38 at 7) when Plaintiff was being treated at the BVAMC for MS is also significant, and it cannot be emphasized enough that Dr. Berryman's opinion as presented in the screening certificate of merit agrees with Plaintiff's allegations. Plaintiff's screening certificates of merit are necessary for his prosecution of his medical negligence claims, and presumptively comply with the requirements under W. Va. Code § 55-7B-6(b).[26] Because this Court has previously determined that "[r]ectifiable deficiencies are generally insufficient to warrant dismissal unless the plaintiff has willfully ignored them and made no effort to correct" (ECF No. 35 at 13)[27], summary judgment would be inappropriate in this case because Plaintiff has demonstrated not only willingness to comply with this Court's Orders but has also displayed continued diligence in prosecuting a complicated medical malpractice case *pro se*.

---

[25] Due the sensitivity of the documents contained herein, the Court ordered that they be placed under seal. (ECF No. 15)

[26] This statute provides:

> The screening certificate of merit shall state with particularity, and include: (A) The basis for the expert's familiarity with the applicable standard of care at issue; (B) the expert's qualifications; (C) the expert's opinion as to how the applicable standard of care was breached; (D) the expert's opinion as to how the breach of the applicable standard of care resulted in injury or death; and (E) a list of all medical records and other information reviewed by the expert executing the screening certificate of merit.

[27] Citing <u>Earle v. City of Huntington</u>, Civil Action No. 3:14-cv-29536, 2016 WL 3198396, at *5 (S.D.W.Va. June 8, 2016).

The undersigned appreciates Defendant's argument[28] that the Supreme Court has stressed that Rule 56 mandates the entry of summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322, 106 S.Ct. 2548. It is noted that the Supreme Court has made clear that a principal purpose of summary judgment "is to isolate and dispose of factually unsupported claims." Id. at 323–324, 106 S.Ct. 2548. It is also noted that the Fourth Circuit has held that "[g]enerally, an affidavit filed in opposition to a motion for summary judgment must present evidence in substantially the same form as if the affiant were testifying in court"[29], however, Plaintiff did not file an affidavit in opposition to Defendant United States of America's Motion for Summary Judgment (or for that matter to Defendant United States of America's Motion to Dismiss for Lack of Subject Matter Jurisdiction and/or Motion for Summary Judgment Against Plaintiff's Claims Relating to George Murphy, M.D.), but has instead expressly relied upon the affidavits he employed as the screening certificates of merit.

The glaring issue before this Court is that Plaintiff has provided opinion evidence in the form of affidavits executed by Drs. Boster and Berryman that very clearly and unambiguously rebut the opinions given by Drs. Lublin and Sze. Additionally, Plaintiff has provided this evidence early in the proceedings, and prior to the dispositive motions filing deadline. As the Supreme Court unanimously held in Haines v. Kerner, 404 U.S. 519, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972), a *pro se* complaint, "however inartfully pleaded," must be held to "less stringent standards than formal pleadings drafted by lawyers" and can only be dismissed for failure to state a claim if it appears "

---

[28] Having reviewed the case law cited by Defendant in its Reply in support of its Motion for Summary Judgment (ECF No. 75), it is not lost on the undersigned that in each case where the court concluded that affidavits submitted in opposition to a motion for summary judgment should be admissible and not conclusory, the parties therein were represented by counsel.
[29] See, Evans v. Technologies Applications & Service Co., 80 F.3d 954, 962 (4th Cir. 1996).

'beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.' " Id., at 520-521, 92 S.Ct. at 596, quoting Conley v. Gibson, 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). In this case, Plaintiff has demonstrated that his medical negligence claim has merit and the fact that he has shown evidence, though "inartful" in its pleading and presentation, renders summary dismissal of his medical negligence claim inappropriate at this time.[30]

Accordingly, the undersigned **RECOMMENDS** that ***Defendant United States of America's Motion for Summary Judgment*** (ECF No. 60) be **DENIED**.

### PROPOSAL AND RECOMMENDATION

The undersigned therefore respectfully **PROPOSES** that the District Court confirm and accept the foregoing findings and **RECOMMENDS** that the District Court **GRANT** ***Defendant United States of America's Motion to Dismiss for Lack of Subject Matter Jurisdiction and/or for Summary Judgment Against Plaintiff's Claims Relating to George Murphy, M.D.*** (ECF No. 58), **DENY** ***Defendant United States of America's Motion for Summary Judgment*** (ECF No. 60), **DENY** ***Plaintiff's Motion for Summary Judgment*** (ECF No. 65) **DENY** ***Defendant's Motion to Strike Plaintiff's Motion for Summary Judgment (ECF No. 65) for Failure to Comply with the Court's Scheduling Order, the Federal Rules of Civil Procedure, and the Local Rules of this Court*** (ECF No. 66), **DENY** ***Defendant's Motion to Strike Plaintiff's Memorandum of Law in Support of its Opposition to Defendant's Motion to Dismiss and for Summary Judgment (ECF No. 64) for Violating L.R.Civ.P. 7.1(a)(2)*** (ECF No. 68), and finally, **DENY** ***Plaintiff's Motion to Strike All of Defendant's Submissions to the Court Pertaining to Its Interpretation of the FTCA and the Defining Terms Within Based on Common Law Fraud*** (ECF No. 78).

---

[30] Plaintiff is not relieved of his burden of proof at trial, however.

The parties are notified that this Proposed Findings and Recommendation is hereby **FILED**, and a copy will be submitted to the Honorable Irene C. Berger, United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and then three days (mailing/service) from the date of filing this Proposed Findings and Recommendation within which to file with the Clerk of this Court, specific written objections, identifying the portions of the Proposed Findings and Recommendation to which objection is made, and the basis of such objection. Extension of this time period may be granted for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. Snyder v. Ridenour, 889 F.2d 1363, 1366 (4th Cir. 1989); Thomas v. Arn, 474 U.S. 140, 155 106 S.Ct. 466, 475, 88 L.E.2d 435 (1985), reh'g denied, 474 U.S. 1111, 106 S.Ct. 899, 88 L.E.2d 933 (1986); Wright v. Collins, 766 F.2d 841 846 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91, 94 (4th Cir.), cert. denied, 467 U.S. 1208, 104 S.Ct. 2395, 81 L.E.2d 352 (1984). Copies of such objections shall be served on opposing parties, District Judge Berger, and this Magistrate Judge.

The Clerk of this Court is directed to file this Proposed Findings and Recommendation and to send a copy of same to the *pro se* Plaintiff and to counsel of record.

ENTER: July 2, 2019.

Omar J. Aboulhosn
United States Magistrate Judge